In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2972

ELLIOT CARLSON, *et al.*,

*Petitioners-Appellees*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 9244 — **Rubén Castillo**, *Chief Judge.*

ARGUED FEBRUARY 18, 2016 — DECIDED SEPTEMBER 15, 2016

Before WOOD, *Chief Judge*, and KANNE and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. During World War II, the U.S. Office of War Information warned the populace that "loose lips sink ships." See The Phrase Finder, http://www.phrases.org.uk/meanings/237250.html (last visited Sept. 15, 2016). But what if the ships sailed some 70 years before the tongues wag? That is the problem we face in the present case, in which Elliot Carl-

son, along with a number of scholarly, journalistic, and his-
toric organizations, seeks access to grand-jury materials
sealed decades ago. The materials concern an investigation
into the *Chicago Tribune* in 1942 for a story it published reveal-
ing that the U.S. military had cracked Japanese codes. The
government concedes that there are no interests favoring con-
tinued secrecy. It nonetheless resists turning over the materi-
als, on the sweeping ground that Rule 6(e) of the Federal
Rules of Criminal Procedure entirely eliminates the district
court's common-law supervisory authority over the grand
jury. It takes the position that no one (as far as we can tell) has
the power to release these documents except for one of the
reasons enumerated in Rule 6(e)(3)(E). If that is so, then Carl-
son and his allies must fail, because his request is outside the
scope of Rule 6(e).

We find nothing in the text of Rule 6(e) (or the criminal
rules as a whole) that supports the government's exclusivity
theory, and we find much to indicate that it is wrong. In fact,
the Rules and their history imply the opposite, which is why
every federal court to consider the issue has adopted Carl-
son's view that a district court's limited inherent power to su-
pervise a grand jury includes the power to unseal grand-jury
materials when appropriate. Because the parties agree that
this is an appropriate instance (if, in fact, the district court has
this power) we affirm the order of the district court.

## I

The story behind our case is a thrilling one, involving es-
pionage, World War II, and legal wrangling. The year is 1942;
the setting, the Pacific Theater. After Pearl Harbor was at-
tacked in December 1941, the shocked U.S. Navy sprang into
action. The Japanese military hoped to sink the remainder of

the U.S. fleet and was aiming to do so in an attack on Midway Island and the Aleutian Islands, nearly 2,000 miles away, in June 1942. The Japanese planned to invade the Aleutians with a small detachment so as to lure U.S. ships out of their safe harbors, then attack those ships with a larger force while simultaneously invading and occupying Midway as the U.S. Navy was distracted. See NORMAN STONE, WORLD WAR TWO 123–24 (2012). Instead, the U.S. Navy forces pulled off a stunning victory, defending Midway and sinking all five carriers that the Japanese had devoted to the operation, as well as some other ships. The victory at Midway was widely seen as a turning point in the Pacific. *Id.* at 124.

How did the U.S. Navy know its plan would work? Unbeknownst to Japan, the United States had broken some critical Japanese codes some two years earlier. ANTHONY BEEVOR, THE SECOND WORLD WAR 307 (2012). The U.S. Navy was thus able to figure out beforehand that Japan's attack on the Aleutians was a feint, and Japan's real goal was to overtake Midway and sink U.S. aircraft carriers in the process. STONE, *supra,* at 123. As the commander-in-chief of the U.S. Pacific Fleet explained in a later report, "[h]ad we lacked early information of the Japanese movement … the Battle of Midway would have ended far differently." BEEVOR, *supra*, at 311.

This explains why senior U.S. officials were so dismayed when the *Chicago Tribune* blew their secret. On June 7, 1942, the *Chicago Tribune*'s banner headline announced victory in the Battle of Midway. Right below, the *Tribune* dropped another bombshell: "Navy Had Word of Jap Plan to Strike at Sea." Stanley Johnston, CHICAGO TRIBUNE, June 7, 1942, at A1. The article explained that the United States knew that Japan

was planning a minor attack on one American base as a dis-
traction from a major attack on another, and this advance no-
tice enabled the Navy to plan its victorious counterattack. The
article appeared to be—and as we now know, in fact was—
based on a classified Navy communiqué that alerted naval
commanders to the impending attack on Midway Island.

The article's publication had immediate consequences:
President Roosevelt and high-ranking military officials called
for a criminal investigation. The Department of Justice com-
plied, empaneling a grand jury and launching an investiga-
tion into whether the article's author and other *Tribune* staff
had violated the Espionage Act of 1917. The grand jury heard
testimony from an assortment of witnesses, including *Tribune*
personnel, several identified military officers, and three or
four unknown officers. Ultimately, the grand jury did not is-
sue any indictments, a decision that the *Tribune* and other
prominent national newspapers hailed as a victory for free
speech.

Fast forward to the present, more than 70 years later. Elliot
Carlson is a journalist and historian with a special expertise
in naval history. He is the author of *Joe Rochefort's War: The
Odyssey of the Codebreaker Who Outwitted Yamamoto at Midway*,
an award-winning book on the commander who broke one of
the Japanese codes. Carlson is currently writing a book on the
*Tribune*'s Midway article and the ensuing investigation. Carl-
son and his co-plaintiffs (to whom we refer in the singular as
"Carlson" for simplicity's sake) filed a petition in the North-
ern District of Illinois asking that court to unseal the tran-
scripts of witness testimony before the *Tribune* grand jury.

Carlson chose the Northern District of Illinois because it
was the court that originally had supervisory jurisdiction over

the grand jury in question. He argued that this same court has continuing common-law authority over matters pertaining to that grand jury, including any application to unseal grand-jury materials. The convening court, for instance, would have the authority to rule on disclosure pursuant to Federal Rule of Criminal Procedure 6(e). Carlson acknowledged that his request falls outside the scope of the circumstances for releasing grand jury materials enumerated in the Rule. Nonetheless, relying on *In re Craig*, 131 F.3d 99 (2d Cir. 1997), Carlson argued that the district court has the inherent power to release grand-jury materials in situations not contemplated by Rule 6(e). He concedes that just as other inherent powers of the court should not be exercised lightly, see *Dietz v. Bouldin*, 136 S. Ct. 1885, 1893 (2016); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), this power too is tightly circumscribed. *Craig* identifies numerous factors that a court should weigh when exercising this limited inherent power.

Carlson argued that his request satisfied these criteria, and the district court agreed with him. It decided first that it possessed the inherent authority to unseal grand-jury materials in situations outside the scope of Rule 6(e)(3)(E). It considered each point identified by *Craig* and concluded that disclosure in this case was warranted. It thus ordered that the transcripts be released. The government has appealed (and the order has been stayed pending appeal). The government agrees that if the district court has inherent authority to unseal grand-jury records, then "the transcripts have sufficient historical value to warrant release" under the *Craig* factors. It argues, however, that Rule 6(e) contains the exclusive list of reasons for which a district court may unseal grand-jury materials, and because historical value is not among them, the court was wrong to grant Carlson's petition.

## II

Before turning to the merits of the appeal, we must assure ourselves that both the district court and we have jurisdiction over this matter. Because neither Carlson nor any of his fellow petitioner-appellees were parties to the underlying grand jury investigation, we must confirm that at least one of them has standing to bring this claim. See *Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011) ("Where at least one plaintiff has standing, jurisdiction is secure[,]" citing *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977)). And because Carlson does not invoke a Federal Rule of Criminal Procedure as the basis for granting his petition to obtain the records, relying instead on the court's inherent power, we must confirm that we have subject-matter jurisdiction. We solicited supplemental briefs from the parties on these important points.

### A

### 1

As a member of the public, Carlson has standing to assert his claim to the grand-jury transcripts, because they are public records to which the public may seek access, even if that effort is ultimately unsuccessful (perhaps because of sealing, national security concerns, or other reasons). Article III of the Constitution limits the federal courts' power to the adjudication of actual "Cases" and "Controversies." U.S. CONST. Art. III. The doctrine of standing has "developed … to ensure that federal courts do not exceed" this authority. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and

(3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). We review each element in turn.

Carlson's injury-in-fact is the denial of access to government documents that he has a right to seek. A plaintiff suffers an injury-in-fact when she is unable to obtain information that is statutorily subject to public disclosure. *Federal Elec. Comm'n v. Akins*, 524 U.S. 11, 20–21 (1998); *Public Citizen v. Dep't of Justice*, 491 U.S. 440, 449 (1989). Injury-in-fact can arise from a comparable common-law source. See *Spokeo*, 136 S. Ct. at 1549; *Id.* at 1550–53 (Thomas, J., concurring) (explaining that plaintiffs asserting common-law injuries can more easily demonstrate injury-in-fact than others). Carlson needs only a "colorable claim" to a right to access these documents, because "[w]ere we to require more than a colorable claim, we would decide the merits of the case before satisfying ourselves of standing." See *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir. 2012); see also *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009).

Thus the question becomes whether Carlson has a colorable claim of a right to obtain access to these documents. He does. Carlson argues that grand-jury records are court documents; he argues further that under the circumstances of this case he has a right to review them. Although the grand jury operates according to a "tradition of independence," *United States v. Williams*, 504 U.S. 36, 47 (1992), "[t]he Constitution itself makes the grand jury part of the judicial process." *Cobbledick v. United States*, 309 U.S. 323, 327 (1940); see also *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) ("the powers of the grand jury are … subject to the supervision of a judge"); *Levine v. United States*, 362 U.S. 610, 617 (1960) (the grand jury

is "an arm of the court"); *Brown v. United States*, 359 U.S. 41, 49 (1959) ("[a] grand jury is clothed with great independence in many areas, but it remains an appendage of the court") *overruled on other grounds by Harris v. United States*, 382 U.S. 162 (1965); *Blair v. United States,* 250 U.S. 273, 278 (1919) ("the inquisitorial function of the grand jury … [is] incident[ to] the judicial power of the United States").

Because the grand jury is "part of the judicial process," *Cobbledick*, 309 U.S. at 327, its "minutes and transcripts" are necessarily "records of the court." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 684–685 (1958) (Whittaker, J., concurring); see also *Standley v. Dep't of Justice*, 835 F.2d 216, 218 (9th Cir. 1987) ("grand jury materials are records of the district court"); *In re Grand Jury Investigation of Cuisinarts, Inc.*, 665 F.2d 24, 31 (2d Cir. 1981) ("*Cuisinarts*") (same); *United States v. Penrod*, 609 F.2d 1092, 1097 (4th Cir. 1979) (same). And because they are records of the court, Carlson has a right to petition for access to them: the public has "a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). The denial at the threshold of the right to petition for access inflicts an injury-in-fact on Carlson. See *Akins*, 524 U.S. at 20–21; *Public Citizen*, 491 U.S. at 449. That his petition is not guaranteed to be granted, because a court may find a valid justification for denying him access, in no way destroys his standing to seek the documents. See *Nixon*, 435 U.S. at 598–99; *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989). To hold otherwise would amount to denying standing to everyone who cannot prevail on the merits, an outcome that fundamentally misunderstands what standing is. See *Booker-El*, 668 F.3d at 900; *Bond*, 585 F.3d at 1073.

For public documents such as these, there is no need for Carlson to show that he has any particular connection to the grand jury proceeding. As we explained in *Jessup v. Luther*, "[r]epresentatives of the press and general public must be given an opportunity to be heard on the question of … access to documents." 227 F.3d 993, 997 (7th Cir. 2000); see also *Corbitt*, 879 F.2d at 228–29 (entertaining newspaper's request to see sealed pre-sentence report, and analogizing pre-sentence report to grand jury materials). To hold otherwise would raise First Amendment concerns. *Cf. United States v. Edwards*, 672 F.2d 1289, 1294 (7th Cir. 1982) (recognizing that the "common law right" of public access to court records "supports and furthers many of the same interests which underlie those freedoms protected by the constitution"); *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cnty.*, 457 U.S. 596, 604, 607 (1982) (holding First Amendment guarantees access to criminal trials, and limitations on access are subject to strict scrutiny); *Butterworth v. Smith*, 494 U.S. 624, 630 (1990) (reiterating, in the context of prohibiting a witness from discussing his testimony, "grand juries are expected to operate within the limits of the First Amendment"). That Carlson is a member of the public is sufficient for him to assert his "general right to inspect and copy … judicial records." *Nixon*, 435 U.S. at 597.

The administrative reality that the physical documents are currently housed in a facility operated by the National Archives and Records Administration (NARA), rather than in a storeroom controlled by the district court, does not change this analysis. NARA is an office of the executive branch; it manages archival documents "to ensure their continued preservation by the United States Government." 44 U.S.C. § 2107(1). The Judiciary uses NARA to store old paper case

files. See National Archives, www.archives.gov/research/cat-alog/ (last visited Sept. 15, 2016) (search for court records). Rule 6(e)(1) explains that after the conclusion of a grand-jury investigation, the government's attorneys will "retain con-trol" of grand-jury materials, "[u]nless the court orders other-wise." This indicates that the grand-jury materials are subject to the court's control. The Committee Notes on Rule 6 further make this clear by explaining that the amendment was en-acted to "accord with present practice," but that the Commit-tee "specifically recognized … that the court in a particular case may have reason to order otherwise." FED. R. CRIM. P. 6(e), Committee Notes 1979. Even when grand-jury materials are in the custody of government attorneys, they "remain the records of the courts, and courts must decide whether they should be made public." *Cuisinarts*, 655 F.2d at 31.

Carlson easily satisfies the other two elements of Article III standing. His injury-in-fact is traceable to the respondent's denial of access to the grand-jury materials. That injury would be redressed by a court order granting him the relief he seeks—access to the transcript. Thus, Carlson has standing to seek access to grand jury materials.

Our decision in *Bond v. Utreras* is not to the contrary—in-deed, it supports this position. 585 F.3d 1061 (7th Cir. 2009). In *Bond*, we drew a sharp line between civil pre-trial discovery documents that were never filed with the court and docu-ments that were filed with the court. *Id.* at 1066. We held that "documents *filed in court* are presumptively open to the pub-lic" and explained that this right of access "is derived from … common-law," codified by statute, and any "judicially im-posed limitations on this right are subject to the First Amend-ment." *Id.* at 1073–74 (emphasis added) (citing, *inter alia*, 28

U.S.C. § 452; *Globe Newspaper Co.*, 457 U.S. at 603–06). We emphasized that although a court may ultimately decide to shield certain documents from the public, the "general right of public access … is enough to give members of the public standing" to seek them. *Id.* at 1074. In contrast, there is no statutory, rule-based, common-law, or constitutional right of the public to obtain discovery documents that are never filed with the court (and that is typically the status of the overwhelming majority of the documents exchanged in civil discovery). A non-party thus has no right to intervene to seek them. *Id.* at 1074–76 (citing *SEC v. TheStreet.com*, 273 F.3d 222, 233 n.11 (2d Cir. 2001)).

The grand-jury transcripts that Carlson seeks are not like privately produced civil discovery that never makes it through the courthouse door. They are created under the authority of the grand jury, and they remain at all times under the power of the court. The Supreme Court has said that "[a]t the foundation of our federal government the inquisitorial function of the grand jury and the compulsion of witnesses were recognized as incidents of the judicial power of the United States." *Blair*, 250 U.S. at 280. A grand jury cannot create any materials without the power of the court being used to empanel the grand jury and issue and enforce its subpoenas. *Levine*, 362 U.S. at 617. Grand-jury transcripts are produced under "the supervision of" the district court, *Branzburg*, 408 U.S. at 688, and as a result they represent an exercise of the court's power; they are "filed with the court," *Bond*, 585 F.3d at 1073. They constitute a form of judicial papers.

Because grand-jury transcripts are, in their very nature, judicial documents (just as a transcript of a trial would be), there

is no need for them to become part of the judicial proceeding through admission into evidence. *Smith v. U.S. Dist. Court for S. Dist. of Ill.*, 956 F.2d 647, 650 (7th Cir. 1992) (judicial records to which there is a presumptive right of access include "transcripts of proceedings" and "items not admitted into evidence"). Thus, the presumptive right of access attaches and is sufficient to "give members of the public standing." *Bond*, 585 F.3d at 1073–74. Carlson asserts a common-law right, and is therefore unlike the journalist in *Bond* who could point to "no constitutional or common-law right" to un-filed pre-trial discovery materials. *Id.* at 1066. And we reiterate that the fact that a rule of criminal procedure or another compelling reason might lead to the denial of Carlson's request in no way affects his standing.

2

Our conclusion that the records Carlson is seeking are court records makes it unnecessary for us to reach his alternative arguments: that they are agency records to which he has a statutory right of access under the Freedom of Information Act, 5 U.S.C. § 552, or NARA's enabling statute and implementing regulations, 44 U.S.C. § 2108(a); or that he has an independent common-law right to petition the court for access to them, which gives him an independent basis for standing.

B

The next question is whether the district court was authorized to entertain this case. We are satisfied that it was. The court had federal-question jurisdiction under 28 U.S.C. § 1331 because this is an action "arising under the Constitution, laws, or treaties of the United States." *Id.* That Carlson is relying

primarily on federal common law does not change this analysis. See *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985). Because the case raises a substantial question relating to the scope and meaning of Rule 6(e), federal-question jurisdiction is also proper under *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 28, 103 (1983). See also *Turner/Ozanne v. Hyman/Power*, 111 F.3d 1312, 1316 (7th Cir. 1997). Resolving that question requires an examination of the relation between the Federal Rules of Criminal Procedure and a long-standing common-law right, thus necessarily raising a substantial federal question. Appellate jurisdiction is proper because the district court's order requiring disclosure finally resolves the only matter that was at issue. See 28 U.S.C. § 1291.

## III

### A

With the jurisdictional brush cleared away, we are ready to reach the merits. The institution of the grand jury reaches as far back as twelfth century England, when the common law itself was developing. See, *e.g.*, Mark Kadish, *Behind the Locked Door of an American Grand Jury: Its History, Its Secrecy, and Its Process*, 24 FLA. ST. U. L. REV. 1 (1996); Alfredo Garcia, *The Fifth Amendment: A Comprehensive and Historical Approach*, 29 U. TOL. L. REV. 209, 227–34 (1998). In the United States, it has been understood as "a constitutional fixture in its own right" that operates "in the courthouse and under judicial auspices." *Williams*, 504 U.S. at 47.

The grand jury is not a free-floating institution, accountable to no one. It is an "arm of the court," and thus falls under the supervisory authority of the district court. See *Levine*, 362

U.S. at 617. It thus follows, as the Supreme Court confirmed both before and after the Criminal Rules were adopted, that the disclosure of sealed grand jury materials is "committed to the discretion of the trial judge." *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959) (after the Rules were adopted); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234 (1940) (before). The question is how the Federal Rules of Criminal Procedure, and in particular Rule 6(e), affect this power.

The inherent supervisory power of the court over the grand jury is well established. The "Constitution itself makes the grand jury a part of the judicial process." *Levine*, 362 U.S. at 617. For example, a grand jury may initiate prosecutions only "under general instructions from the court to which it is attached and to which, from time to time, it reports its findings." *Id.*; see also 18 U.S.C. § 3331 (district court's power to summon grand jury); FED. R. CRIM. P. 6(a) (same). And the grand jury may rely on the court's authority to "compel a witness to appear" only because it is an "arm of the court." *Levine*, 362 U.S. at 617; see also 28 U.S.C. § 1826(a) (district court's power to issue subpoena); FED. R. CRIM. P. 17(a) (same); *In re Grand Jury Proceedings*, 507 F.2d 963, 965 n.2 (3d Cir. 1975) (discussing the same).

The matters over which the court exercises supervisory authority range from the mundane to the weighty. They include routine decisions regarding the daily operation of the grand jury when Rule 6 is ambiguous on a particular detail. For example, prior to 1979, Rule 6(d) stated that recording grand-jury proceedings was optional—"a stenographer or operator of a recording device may be present while the grand jury is in session"—but it did not specify who decided what

to do. Every court to consider the issue said that this decision was left to the discretion of the trial court. See *United States v. Price*, 474 F.2d 1223, 1225 (9th Cir. 1973) ("recordation of grand jury proceedings should be routine and nonrecordation should be permissible only in exceptional circumstances"); *United States v. Aloisio*, 440 F.2d 705, 708 & n.2 (7th Cir. 1971); *Schlinsky v. United States*, 379 F.2d 735, 740 (1st Cir. 1967) (noting prosecutor's practice of not recording and stating, "[w]hether, under our supervisory power … we should now … condemn [this practice] for the future, is not presented.").

Given the grand jury's role as an independent body, however, the district court's supervisory power is "a very limited one." *Williams*, 504 U.S. at 50. It does not "permit judicial reshaping of the grand jury institution." Rather, it may be used only to "preserve or enhance the traditional functioning" of the grand jury. *Id.* For example, a district court does not have the power to order a prosecutor to present exculpatory evidence to a grand jury. Such an order would be inappropriate because, rather than "enhancing the traditional functioning" of a grand jury, it would "alter the grand jury's historical role." *Id.* at 50–51.

Yet this limited inherent supervisory power has historically included the discretion to determine when otherwise secret grand-jury materials may be disclosed. Prior to the adoption of the Federal Rules of Criminal Procedure, the Supreme Court held that release of sealed grand jury materials "rests in the sound discretion of the [trial] court" and "disclosure is wholly proper where the ends of justice require it." *Socony-Vacuum Oil Co.*, 310 U.S. at 233–34.

The advent of the Criminal Rules did not eliminate a district court's inherent supervisory power as a general matter.

Rule 57(b) recognizes that the rules are not designed to be comprehensive; instead, it says, "when there is no controlling law … [a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." FED. R. CRIM. P. 57(b). (This Rule has remained substantively the same since the original 1944 version.) To be sure, the court is powerless to *contradict* the Rules where they have spoken, just as the court cannot contradict a statute. *Dietz*, 136 S. Ct. at 1892; *Carlisle v. United States*, 517 U.S. 416, 420–21 (1996); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988). But it is Rule 57(b), not *Carlisle* or *Bank of Nova Scotia*, that informs us what a court may do when the Rules are silent.

The Supreme Court has repeatedly stated that permissive rules do not "abrogate the power of the courts" to exercise their historic "inherent power" when doing so does not contradict a rule. *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962) (with respect to FED. R. CIV. P. 41(b)). Just this year, it said so again. *Dietz*, 136 S. Ct. at 1891–92. A permissive rule—that is, a rule that permits a court to do something and does not include any limiting language—should not give rise to a negative inference that it abrogates the district court's inherent power without a "clear[] expression of [that] purpose." *Link*, 370 U.S. at 631–32; *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir. 1989) ("mere absence of language in the federal rules specifically authorizing or describing a particular judicial procedure should not, and does not, give rise to a negative implication of prohibition").

This general principle applies to Rule 6, which has been construed not to eliminate the limited inherent supervisory authority the district courts have historically wielded over the administration of a grand jury. As the Supreme Court put it,

Rule 6(e) is "but declaratory" of the long-standing "principle" that "disclosure" of grand jury materials is "committed to the discretion of the trial court." *Pittsburgh Plate Glass Co.*, 360 U.S. at 399. Since then, the Court has "stressed that wide discretion must be afforded to district court judges in evaluating whether disclosure is appropriate." *United States v. John Doe, Inc. I*, 481 U.S. 102, 116 (1987); *Pittsburgh Plate Glass Co.*, 360 U.S. at 400 ("This Court has long held that there are occasions when the trial judge may in the exercise of his discretion order the minutes of a grand jury witness produced for use on his cross-examination at trial. Certainly disclosure is wholly proper where the ends of justice require it." (internal citations and quotation marks omitted)); *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 221, 223 (1979) ("[W]e emphasize that a court called upon to determine whether grand jury transcripts should be released necessarily is infused with substantial discretion."); see also *Procter & Gamble Co.*, 356 U.S. at 689. Thus, the existence of Rule 6 does not, by itself, eliminate the court's power to address situations that the Rule does not describe.

B

The government urges, however, that there is a textual basis in the rule that supports its position. We therefore turn to a closer examination of the Rule's language. Rule 6(e) is entitled "Recording and Disclosing the Proceedings [of the grand jury]." Subpart (1) requires that the proceedings be recorded. Subpart (2) is entitled "secrecy." Rule 6(e)(2)(A) states that "no obligations of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B)." Rule 6(e)(2)(B) provides that "[u]nless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand

jury … ." The list identifies seven types of people who fall within that prohibition: a grand juror; an interpreter; a court reporter; an operator of a recording device; a person who transcribes recorded testimony; an attorney for the government; or a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii). Rule 6(e)(3), sets out some exceptions to the norm of nondisclosure. Subsection (A), (B), and (C) of Rule 6(e)(3) describe when grand jury materials can be disclosed *without* the court's permission—for instance, to other government attorneys or other grand juries—and contain limitations on the purposes for which that disclosed information can be used. Subsection (D) relates to foreign intelligence and similar materials; it is not involved here.

Subsection (E), that is, Rule 6(e)(3)(E), is the section at issue here: it describes disclosures that the *court* may authorize. It states:

> (E) The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand jury matter
>
>> (i) preliminarily to or in connection with a judicial proceeding;
>>
>> (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury; …

and at the request of (iii) a foreign government; (iv) tribal government; or (v) U.S. military, all for the purpose of enforcing their respective criminal laws. FED. R. CRIM. P. 6(e)(3)(E).

The government's primary textual argument is that the phrase "[u]nless these rules provide otherwise," which appears only in Rule 6(e)(2)(B), somehow carries over to all of Rule 6 and provides conclusive proof that the court's power in subpart (3)(E) is limited to the purposes listed under that heading. This makes no sense, either as a reading of Rule 6(e) or as a general matter of statutory (or rule) construction. The government provides no explanation for why a limitation buried in subsection (B) of subpart (2) of Rule 6(e) secretly applies to the rule as a whole, or even worse (as it seems to be saying) to an entirely different subpart. We do not know of any principle of interpretation supporting this position, nor could the government provide us with any examples at oral argument.

It is far more reasonable to read Rule 6(e)(2)(B) as specifying, "unless these rules provide otherwise," which persons are bound to keep grand-jury materials secret, and then to read Rule 6(e)(3)(E) as telling the *court* to whom it "may" authorize disclosure, without indicating anywhere that the list is exclusive. There is nothing odd or counterintuitive in having one rule for disclosures that may not occur without court supervision, and a different rule for disclosures specifically ordered by the court.

Nor can we find language elsewhere in the rule supporting the government's exclusivity theory. The government suggests that it is helped by Rule 6(e)(6), which states, "[r]ecords, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure[.]" This tells us that "disclosure of matters occurring before a grand jury is the exception and not the rule." *Fund for Constitutional Gov't*

*v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 868 (D.C. Cir. 1981). But it says nothing about when disclosures are "unauthorized."

The few hints that we find in the text of Rule 6(e) all indicate that the list in subpart (3)(E) is *not* exclusive. The presence of limiting language elsewhere in Rule 6(e), in (2)(B), indicates that its absence in (3)(E) is intentional. FED. R. CRIM. P. 6(e)(2)(B). A rule of nonexclusivity does not mean that Rule 6(e)(3)(E) is pointless: it would be entirely reasonable for the rulemakers to furnish a list that contains frequently invoked reasons to disclose grand-jury materials, so that the court knows that no special hesitation is necessary in those circumstances. In addition, the permissive language of Rule 6(e)(3)(E) provides some support for Carlson's position: it uses the word "may," which "usually implies some degree of discretion." *United States v. Rodgers*, 461 U.S. 677, 706 (1983). It also underscores that, when ordering disclosure pursuant to 6(e)(3)(E), the court has complete discretion over the manner of disclosure ("at a time, in a manner, and subject to any other condition it directs"). While this discretionary language presumably refers to discretion within the confines of Rule 6(e)(3)(E), it provides some support for the general proposition that courts have discretion when unsealing records.

The history of the rules and the Committee Notes also support our reading of Rule 6(e)(3)(E). The Federal Rules of Criminal Procedure first appeared in 1944; the modern version of Rule 6(e) was enacted directly by Congress in 1977. See Pub. L. No. 95-78 § 2(a), 91 Stat. 319, 319 (1977); see generally *In re Grand Jury Proceedings, Miller Brewing Co.*, 687 F.2d 1079, 1087 (7th Cir. 1982) (discussing history of the 1977 amendments) *vacated in part on other grounds*, 717 F.2d 1136 (7th Cir. 1983).

Since that time, there have been stylistic revisions, but the substance of what is now Rule 6(e)(3)(E) is unchanged. The Committee Notes, to which we give some weight, see *Schiavone v. Fortune*, 477 U.S. 21, 31 (1986), also indicate that the Rule does not displace a court's limited inherent power to address situations not contemplated by the Rules.

Rule 6 was first enacted to "continue[] the traditional practice of secrecy on the part of members of the grand jury, except when the court permits a disclosure." FED. R. CRIM. P. 6, Committee Notes 1944. It has been updated in response to court practices, but one of those practices has been the recognition of the district court's wide discretion to address new situations as they arise. In the specific context of Rule 6(e)'s secrecy requirement, "as new exceptions outside of those enumerated in Rule 6(e) have gained traction among the courts, the scope of the rule has followed suit." *In re Kutler*, 800 F. Supp. 2d 42, 45 (D.D.C. 2011) (finding that special circumstances justified release of grand-jury records). The Supreme Court in *Douglas Oil Co. of California* acknowledged that the Rules Committee updated Rule 6 in response to courts' "recognition of the occasional need for litigants to have access to grand jury materials." 441 U.S. at 220. To the same effect, the Southern District of New York observed that "exceptions to the secrecy rule generally have developed through conformance of Rule 6 to the 'developments wrought in decisions of the federal courts,' not *vice versa*." *In re Am. Historical Ass'n*, 49 F. Supp. 2d 274, 285 (S.D.N.Y. 1999) (quoting *In re Hastings*, 735 F.2d 1261, 1268 (11th Cir. 1984)).

The government also finds solace in the history of some unsuccessful efforts to change the rules, but this is notoriously unreliable evidence, even for those who are sympathetic to

legislative history. And in any event, the Advisory Committee on Criminal Rules noted in the minutes of its meeting that it saw no need for the amendments because the courts had inherent power. We give this history no weight one way or the other.

Finally, we consider the decisions of our sister circuits. There, too, the government stands alone: no court has accepted its position. The Second, Eleventh, and D.C. Circuits have all considered the issue and held that Rule 6(e)(3)(E) contains a permissive, not exhaustive, list of reasons for release of grand jury materials. See *Craig*, 131 F.3d at 101–03; *In re Biaggi*, 478 F.2d 489 (2d Cir. 1973); *Hastings*, 735 F.2d at 1268; *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (*en banc*). And the government acknowledged at oral argument that no district court has bought its theory either. See, *e.g.*, *Am. Historical Ass'n*, 49 F. Supp. 2d at 285; *In re Report & Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. 1219, 1229 (D.D.C. 1974)

The Second Circuit's reasoning in *Craig* is the most comprehensive. In *Craig*, a historian petitioned for the transcript of the grand jury investigation of Harry Dexter White, an Assistant Secretary of the Treasury accused in 1948 of being a communist spy. *Craig*, 131 F.3d at 101. The court held that a district court has the inherent power to disclose the materials in exceptional circumstances and noted that historic importance can be a sufficient reason when there is little countervailing need for secrecy. *Id.* at 105. It emphasized that this inherent power is "consonant with the role of the supervising court and will not unravel the foundations of secrecy upon which the grand jury is premised." *Id.* at 103. Thus, given the great weight of authority against the government's position,

it "reject[ed] the government's suggestion that [the court] unsettle this area of good law." *Id.* This accords with the Eleventh Circuit's comprehensive analysis in *Hastings*, and the D.C. Circuit's briefer reasoning to the same effect in *Haldeman*. See *Hastings*, 735 F.2d at 1268; *Haldeman*, 501 F.2d at 715.

We have already gone so far as to say, in dicta, that "[w]e may not always be bound by a strict and literal interpretation of Rule 6(e) in the situation where there is some extraordinary and compelling need for disclosure in the interest of justice, and little traditional need for secrecy remains[.]" *In re Special Feb., 1975 Grand Jury*, 662 F.2d 1232, 1238 (7th Cir. 1981) *aff'd on other grounds sub nom.*, *United States v. Baggot*, 463 U.S. 476 (1983); see also *Corbitt*, 879 F.2d at 239 ("it is clear that disclosure of grand jury materials in situations not governed by Rule 6(e) should be an uncommon occurrence."); *Miller Brewing Co.*, 687 F.2d at 1088 (district court "may not always be bound by a strict and literal interpretation of Rule 6(e)"). The Tenth Circuit has likewise acknowledged that "some relief may be proper under the court's inherent authority" when there is a compelling need to unseal grand jury records for reasons not mentioned in Rule 6(e). *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1178 (10th Cir. 2006).

The government argues that these opinions are no longer good law after *Carlisle*, 517 U.S. 416, and *Bank of Nova Scotia*, 487 U.S. 250. That point falls flat. The Second Circuit's *Craig* decision post-dates both *Carlisle* and *Bank of Nova Scotia*, and the government cited them both to that court. And in any event, all that *Carlisle* and *Bank of Nova Scotia* say is that a court may not directly contradict a Rule. We have already explained why Carlson is asking for no such thing.

We are persuaded by the logic of Carlson's arguments and the approach of our sister circuits, with whom we now join. The text and history of the Rules indicate that Rule 6(e)(3)(E) is permissive, not exclusive, and it does not eliminate the district court's long-standing inherent supervisory authority to make decisions as needed to ensure the proper functioning of a grand jury. While this inherent supervisory authority is limited to "preserv[ing] or enhanc[ing] the traditional functioning" of the grand jury, *Williams*, 504 U.S. at 50, that includes the power to unseal grand jury materials in circumstances not addressed by Rule 6(e)(3)(E). See *Pittsburgh Plate Glass Co.*, 360 U.S. at 399–400.

## IV

Given that the district court did have the power to exercise its discretion to determine whether to release the requested grand jury materials, the only remaining question is whether it abused that discretion. The government concedes that it did not, and we see nothing in this record that would justify a contrary finding, even had this point not been waived. The district court engaged in a thoughtful and comprehensive analysis of the pros and cons of disclosure before granting Carlson's request, and we are content to let its analysis stand.

The district courts retain certain inherent powers, as the Supreme Court reaffirmed in *Dietz*. One such power relates to their supervision of the disclosure of grand-jury materials. We join with our sister circuits in holding that Rule 6(e)(3)(E) does not displace that inherent power. It merely identifies a permissive list of situations where that power can be used. We therefore AFFIRM the order of the district court.

SYKES, *Circuit Judge*, dissenting. Rule 6 of the Federal Rules of Criminal Procedure comprehensively governs the conduct of grand-jury proceedings, and subpart (e) of the rule requires that all matters occurring before the grand jury must be kept secret, subject to certain narrow exceptions. *See* FED. R. CRIM. P. 6(e)(2)(B), (e)(3)(E). The petitioners here—a group of historians and journalists—asked the district court to unseal grand-jury records from a World War II–era espionage investigation described in fascinating detail in Chief Judge Wood's opinion. The documents have historical significance, but none of the rule's exceptions to secrecy even arguably applies. To get around this impediment, the petitioners argued that the exceptions are permissive, not exclusive, and the district court has inherent authority to unseal grand-jury materials for reasons not covered by the rule—here, historical interest.

The United States objected, arguing that the secrecy exceptions are exclusive and the court has no authority to disclose grand-jury materials in circumstances not specified in Rule 6(e)(3)(E). The district judge sided with the petitioners and construed the rule's exceptions as only exemplary. Relying on the court's "inherent authority" and applying a multifactor test developed by the Second Circuit in *In re Craig*, 131 F.3d 99, 106 (2d Cir. 1997), the judge ordered the grand-jury records unsealed.

My colleagues likewise adopt the permissive interpretation and affirm the district court's order unsealing the 70-year-old grand-jury materials. I respectfully dissent. In my view, the government's interpretation of Rule 6(e)(3)(E) is the correct one. Treating the rule's list of authorized disclosures as merely permissive is inconsistent with the text and structure of the rule. I would reverse the district court's order.

Rule 6(e) "codifies the traditional rule of grand jury se-crecy," *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983), together with certain narrow exceptions, most of which deal with information sharing between federal prosecutors and other governmental agents for law-enforcement purposes. *See* FED. R. CRIM. P. 6(e)(3). Rule 6(e) is captioned "Recording and Disclosing the Proceedings" and begins by establishing a re-cording requirement: "Except while the grand jury is deliber-ating or voting, all proceedings must be recorded by a court reporter or suitable recording device." *Id.* RULE 6(e)(1). The rule then designates the government's lawyer as the custodian of the record: "Unless the court orders otherwise, an attorney for the government will retain control of the recording, the reporter's notes, and any transcript prepared from those notes." *Id.*

The next subsection imposes a broad secrecy norm:

> **(2) Secrecy.**
>
> …
>
> **(B)** *Unless these rules provide otherwise*, the fol-lowing persons *must not disclose a matter occur-ring before the grand jury*:
>
> > **(i)** a grand juror;
> >
> > **(ii)** an interpreter;
> >
> > **(iii)** a court reporter;
> >
> > **(iv)** an operator of a recording device;
> >
> > **(v)** a person who transcribes recorded testimony;
> >
> > **(vi)** an attorney for the government; or

> **(vii)** a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

FED. R. CRIM. P. 6(e)(2)(B) (emphases added). This list of persons bound by the nondisclosure obligation includes all participants in the grand jury's proceedings except witnesses.

The very next subsection contains the exceptions to the secrecy rule. As I've noted, most of the exceptions pertain to the authority of the government's lawyers to disclose grand-jury materials to other grand juries and to governmental officials as necessary to perform law-enforcement duties in specified circumstances. *See id.* RULE 6(e)(3)(A)–(D). These authorized disclosures require no court intervention.

The exception at issue here pertains to *the court's* authority to unseal grand-jury records. It states as follows:

> **(E)** The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter:
>
> > **(i)** preliminarily to or in connection with a judicial proceeding;
> >
> > **(ii)** at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury; …

or at the request of the government's lawyer when the records are sought by (iii) a foreign government; (iv) a tribal government; or (v) a U.S. military official for the purpose of enforcing their respective criminal laws. *Id.* RULE 6(e)(3)(E).[1]

Three of the five circumstances on this list require a request from the government. *Id*. RULE 6(e)(3)(E)(iii)–(v). A fourth permits the court to order disclosure "at the request of a defendant" seeking dismissal of an indictment. *Id*. RULE 6(e)(3)(E)(ii). The only provision that contemplates release of grand-jury materials to a member of the general public is subsection (e)(3)(E)(i), which authorizes the court to order disclosure "preliminarily to or in connection with a judicial proceeding." The Supreme Court has held that this exception applies only when the purpose of the disclosure is "to assist in preparation or conduct of a judicial proceeding" that is "pending or anticipated." *United States v. Baggot*, 463 U.S. 476, 480 (1983).

It's easy to see (and everyone agrees) that none of these exceptions even arguably applies to the petitioners' request, which is not made by the government or a defendant and has nothing to do with a judicial proceeding. My colleagues, however, read the list of exceptions as permissive, not exhaustive. As they see it, the limiting language in subsection (e)(2)(B)— "unless these rules provide otherwise"—is confined to the secrecy provision (where it appears) and has no effect on the

---

[1] The rest of subpart (e) establishes rules for sealing indictments, closing court hearings collateral to grand-jury proceedings, maintaining grand-jury records under seal, and punishing knowing violations of Rule 6 by contempt. *See* FED. R. CRIM. P. 6(e)(4)–(7).

operation of the exceptions. On this reading the exceptions
are nonexclusive, leaving the district court with residual in-
herent authority to disclose grand-jury materials to persons
and for purposes not identified in the rule. With respect, I can-
not agree.

In my view, the secrecy requirement and its exceptions
must be read together as an integrated whole. After all, the
provisions appear sequentially and work together. First, sub-
section (e)(2)(B) imposes a strict nondisclosure rule "unless
these rules provide otherwise." Next, subsection (e)(3) creates
a few narrowly tailored exceptions, one of which empowers
the court to disclose grand-jury materials to specified persons
in specified circumstances. The limiting language in the se-
crecy provision necessarily means that the exceptions are a
closed set: Subsection (e)(2)(B) mandates grand-jury secrecy
"unless these rules provide otherwise"; the exceptions in sub-
section (e)(3) "provide otherwise," but the court's authority to
override the secrecy norm is limited to the particular circum-
stances specified in Rule 6(e)(3)(E).

As my colleagues interpret the rule, the limiting language
in the secrecy provision has no bearing at all on the excep-
tions; the phrase "unless these rules provide otherwise" is
"buried" in subsection (e)(2)(B) and cannot "secretly appl[y]"
to the exceptions, which are found in "an entirely different
subpart" of the rule. Majority op. at 19. But the two provisions
cannot be read in isolation. They appear together in subpart
(e), sequentially, and govern the same subject matter. The ex-
ceptions plainly modify the general rule of nondisclosure.
Treating the exceptions as merely exemplary puts the two
provisions at cross-purposes: If the district court has inherent
authority to disclose grand-jury materials to persons and in

circumstances not listed in subsection (e)(3)(E), the limiting phrase "unless these rules provide otherwise" in the secrecy provision is ineffectual.

Indeed, the Supreme Court has recognized that Rule 6(e) "is, on its face, an affirmative limitation on the availability of court-ordered disclosure of grand jury materials." *Baggot*, 463 U.S. at 479. *Baggot* held that the district court's authority to disclose grand-jury materials "preliminarily to or in connection with a judicial proceeding" does not include the authority to order disclosure to the Internal Revenue Service in connection with the determination of a taxpayer's civil tax liability. *Id*. at 480–82. The Court explained that Rule 6(e) "reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy." *Id*. at 480.

It goes without saying that the district court's inherent authority does not include the power to contravene or circumvent an "express grant of or limitation on the … court's power contained in a rule or statute." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016); *see also Carlisle v. United States*, 517 U.S. 416, 426 (1996) ("Whatever the scope of [the court's] 'inherent power,' … it does not include the power to develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure."); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (holding that a district court cannot invoke its inherent authority to circumvent the harmless-error inquiry required by Rule 52(a) of the Federal Rules of Criminal Procedure). Rule 6(e) is an express limitation on the court's inherent authority. It codifies the common-law rule of grand-jury secrecy subject to certain narrowly delimited exceptions and requires

that secrecy be maintained unless the rules specifically authorize disclosure.

To read the exceptions as permissive rather than exclusive disregards the text of the rule, which *mandates* secrecy "unless these rules provide otherwise." The straightforward meaning of this text is that grand-jury secrecy may not be breached except as specifically provided in the rules. To give effect to this limiting language, the list of authorized disclosures in subsection (e)(3)(E) must be interpreted as exclusive, not merely exemplary, leaving the court with no residual authority to disclose grand-jury records to persons and for reasons not covered by the rule—not even reasons of historical significance, surely a beneficial purpose, but one not addressed in the rule.

Accordingly, I cannot join the majority's decision to endorse the approach taken by the Second and Eleventh Circuits, both of which have held that the district court retains inherent authority to disclose grand-jury materials in "special circumstances" outside the confines of Rule 6(e). *In re Craig*, 131 F.3d at 104–06; *In re Hastings*, 735 F.2d 1261, 1268–69 (11th Cir. 1984). My colleagues include the D.C. Circuit on this list of permissive circuits, citing *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (en banc). I think that's right, but it bears noting that the *Haldeman* order simply announces the en banc court's agreement with the district judge's decision; it contains no reasoning. *Id*. at 715.

On the other hand, the Eighth Circuit interprets the rule as I do. That circuit treats the secrecy exceptions in Rule 6(e)(3)(E) as exclusive. *United States v. McDougal*, 559 F.3d 837, 840 (8th Cir. 2009) ("[C]ourts will not order disclosure absent a recognized exception to Rule 6(e) or a valid

challenge to the original sealing order or its implementation."). For the reasons I've already explained, I come down on the Eighth Circuit's side of this interpretive divide.

Finally, even if the district court retains some residual inherent authority to disclose grand-jury records outside the circumstances specified in Rule 6(e), I question whether this authority encompasses the power to fashion a new exception to the rule of grand-jury secrecy based solely on historical interest. As the Supreme Court has explained, the grand jury is independent of the court; it is not "textually assigned … to any of the branches described in the first three Articles" but "is a constitutional fixture in its own right." *United States v. Williams*, 504 U.S. 36, 47 (1992) (internal quotation marks omitted). "[T]he whole theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *Id*. And "[a]lthough the grand jury normally operates … in the courthouse and under judicial auspices, its institutional relationship with the Judicial Branch has traditionally been, so to speak, at arm's length." *Id*.

*Williams* thus reaffirmed the principle that the grand jury is operationally separate from and functionally independent of the court, *id*. at 47–50, and explained that the judge's "direct involvement in the functioning of the grand jury has generally been confined to the constitutive one of calling the grand jurors together and administering their oaths of office," *id*. at 47. As such, "any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings." *Id*. at 50.

It's hard to see how this "very limited" authority includes the sweeping power to release grand-jury records to the general public for reasons that strike the judge as socially desirable—here, historical significance. The court's inherent authority over *its own* proceedings extends only to actions that protect and vindicate the judicial process and the judicial institution itself. *See, e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991) (explaining that the court's inherent authority includes the power to punish contempt, regulate admission to the bar, discipline attorneys for misconduct, dismiss suits for failure to prosecute, and enforce decorum in the courtroom); *United States v. Hasting*, 461 U.S. 499, 505 (1983) (explaining that the court's inherent authority includes the power to protect the integrity of judicial processes). If, as the Supreme Court held in *Williams*, the court's inherent authority over grand-jury procedure is *far more limited*, I doubt that it includes the power to promulgate new exceptions to grand-jury secrecy completely untethered to any judicial proceeding or for reasons wholly unrelated to the judicial process.[2]

---

[2] There are certainly good policy arguments to amend Rule 6(e) to give the district court discretionary authority to unseal historically significant grand-jury records when the reasons for maintaining secrecy have abated. Indeed, the Department of Justice proposed such an amendment in 2011. *See generally* Letter from Hon. Eric H. Holder, Jr., Att'y Gen., to Hon. Reena Raggi, Chair, Advisory Comm. on the Criminal Rules (Oct. 18, 2011), http://www.uscourts.gov/rules-policies/archives /suggestions/hon-eric-h-holder-jr-11-cr-c.

In June 2012 the Federal Advisory Committee on the Criminal Rules rejected the proposal. *See* Judicial Conference Comm. on Rules of Practice and Procedure, Minutes of Meeting June 11–12, 2012, at 44, http://www.uscourts.gov/rules-policies/archives/meeting-minutes/ committee-rules-practice-and-procedure-june-2012. The minutes reflect that the committee saw no need for the amendment, concluding that "in the

Accordingly, I would reverse the district court's order. The court lacked the authority to unseal the *Chicago Tribune* grand-jury records based solely on their historical significance, a reason not addressed in Rule 6(e)(3)(E).

---

rare cases where disclosure of historic materials had been sought, the district judges acted reasonably in referring to their inherent authority." *Id.* My colleagues decline to give this history any weight "one way or the other," majority op. at 22, and I agree.